**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION**

UNIVERSAL SERVICES OF AMERICA, LP; and UNIVERSAL PROTECTION SERVICE, LLC D/B/A ALLIED UNIVERSAL SECURITY SERVICES,

Plaintiffs,

v.

JOHN DAVENPORT-CORTIVO,

Defendant.

Case No.:

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

**DEMAND FOR JURY TRIAL**

Plaintiff Universal Services of America, LP and Universal Protection Service, LLC d/b/a Allied Universal Security Services (together "Allied Universal" or "Plaintiffs"), by and through their undersigned counsel, file this Verified Complaint for Injunctive Relief and Damages against Defendant John Davenport-Cortivo ("Davenport-Cortivo") and state as follows:

## INTRODUCTION

Plaintiffs bring this action to stop Davenport-Cortivo from using Allied Universal's employee relationships and confidential information to raid its workforce in breach of a written agreement. Davenport-Cortivo supervised Allied Universal's Security Professionals at a large well known online retail distribution center in the St. Louis metropolitan area. In that role, he had full access to the Security Professionals and other employees' pay rates, work schedules, and personal contact information.

During his employment with Allied Universal, Davenport-Cortivo signed an Employment and Non-Compete Agreement ("Agreement"). For twelve months following his last day of employment, the Agreement prohibits him from: (a) engaging in any Competitive Activity, or assisting anyone else in engaging in Competitive Activity, within the Prohibited Territory — the

cities, counties, and territories he served or was assigned during his last twelve months of employment; (b) soliciting, servicing, or diverting Allied Universal's Restricted Customers, interfering with its supplier relationships, or disparaging the Company; and (c) recruiting, soliciting, hiring, or encouraging Allied Universal's employees or independent contractors to leave the Company. The Agreement separately prohibits him, for five years following his last day of employment, from using or disclosing Allied Universal's Confidential Information.

On September 17, 2026, Davenport-Cortivo resigned and joined GardaWorld, a direct competitor. Since leaving Allied Universal, Davenport-Cortivo has been using the pay rates, work schedules, personal contact information, and other confidential information of the Security Professionals who reported to him at the work site he managed, in order to recruit them to work for GardaWorld. The raid threatens Allied Universal's ability to properly staff the client's location and deliver on its own contractual obligations to the client. This threatens Allied Universal's overall business relationship with this client, which spans multiple sites across multiple states.

By going to work for GardaWorld — a direct competitor in the security-services business — performing the same work he did for Allied Universal, in the same territory he served during his final months there, and within twelve months of his departure, Davenport-Cortivo is in violation of the Agreement. Through his conduct, he breached the Non-Compete covenant (Section 4A) by taking the same security-services work for a direct competitor, in the same territory, within twelve months of his departure. He breached the Non-Raiding covenant (Section 4C) by recruiting and soliciting the very Security Professionals he once supervised to follow him to GardaWorld. And he breached the Confidential Information covenant (Section 4D) by using Allied Universal's confidential pay rates, work schedules, and personal contact information he took from its

WinTeam system to identify and solicit those employees. As set out below, the facts establish each element of every one of these covenants.

**PARTIES**

1. Plaintiff Universal Services of America LP ("USA") is a Limited Partnership organized and registered in California.

2. Plaintiff Universal Protection Service LLC is an operating subsidiary of USA. It provides contract security services to client sites across the United States, including retail distribution warehouses in the St. Louis area.

3. Upon information and belief, Davenport-Cortivo is an individual and a resident of the State of Missouri, who may be served with process at 1139 Roller Road, Saint Clair, Missouri 63077-2808.

**JURISDICTION AND VENUE**

4. On July 1, 2026, Davenport-Cortivo entered into an Agreement with USA, which contains post-employment restrictive covenants. A true and correct copy of the Agreement is attached as Exhibit A.

5. The Agreement is governed by Missouri law. *See* Ex. A, § 14.

6. Davenport-Cortivo irrevocably consented to the jurisdiction and venue of the courts in Missouri, whether federal or state, for all disputes related to the Post Separation Obligations in the Agreement. *See* Ex. A, § 14.

7. This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §1332, in that there is complete diversity between the parties and at least $75,000 at issue.

8. Plaintiff Universal Services of America, LP ("USA"), which does business as Allied Universal Security Services ("Allied Universal"), is a limited partnership that is incorporated in

Delaware with its principal place of business in California. A limited partnership is a citizen of each State of which its partners are citizens. USA's partners are (i) USA Intermediate, Inc., a corporation incorporated in Delaware with its principal place of business in Delaware, and (ii) USA GP Sub LLC, a Delaware limited liability company whose sole member is USA Intermediate, Inc. Because each of USA's partners is, directly or through USA GP Sub LLC, USA Intermediate, Inc., USA is a citizen of Delaware with its principal place of business in California.

9. Plaintiff Universal Protection Service, LLC, which does business as Allied Universal Security Services ("Allied Universal"), is a limited liability company and is a citizen of each State of which its members are citizens. Allied Universal's sole member is Universal Protection Service, LP, which is itself a citizen of each State of which its partners are citizens. Those partners are: (a) Allied Universal Sideco, Inc., incorporated in Delaware with its principal place of business in Pennsylvania; (b) American Security Programs, Inc., incorporated in Virginia with its principal place of business Virginia; (c) G4S Secure Solutions (USA) Inc., incorporated in Florida with its principal place of business in Maryland; (d) Universal Services of America, LP, a citizen of Delaware with its principal place of business in California, as alleged in ¶ 8; (e) U.S. Security Associates Holding Corp., incorporated in Delaware with its principal place of business in California and (f) Universal Protection GP, Inc., incorporated in Delaware with its principal place of business in California. Accordingly, Allied Universal is a citizen of Delaware, Florida, Maryland, Pennsylvania, Virginia, Florida, and of each additional State in which the foregoing corporate partners maintain their principal places of business.

10. None of the Plaintiffs is a citizen of Missouri.

11. Defendant Davenport-Cortivo is a citizen of Missouri. Because no Plaintiff shares Missouri citizenship with Davenport-Cortivo, complete diversity exists among the parties under 28 U.S.C. § 1332.

12. The amount in controversy exceeds $75,000 because, *inter alia,* the value of Allied Universal's customer relationships, and the overall client relationships that Davenport-Cortivo has threatened attempted to interfere with, exceed seventy-five thousand dollars ($75,000.00).

13. This Court has supplemental jurisdiction over Allied Universal's state-law claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the federal claim.

14. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this suit occurred in this district, including Davenport-Cortivo's employment and his solicitation of Allied Universal's workforce in the St. Louis metropolitan area.

## FACTUAL BACKGROUND

### A. Allied Universal's Business Operations.

15. Allied Universal is a security services company that provides customized security solutions to a wide array of businesses and sites throughout the United States, including large retail distribution and fulfillment centers.

16. Allied Universal provides security services to these sites through a service contract with the retailers themselves, which generally require Allied Universal to provide a specified number of hours of security coverage at the site.

17. To deliver security services, Allied Universal recruits, screens, trains, and retains a skilled workforce of Security Professionals. Assembling and keeping that workforce is extremely

difficult because it takes significant time and expense due to the site-specific training and certification many clients require.

18. Allied Universal maintains a substantial amount of confidential and proprietary information. That information includes its employees' pay rates, work schedules, personal contact information, and other personnel data maintained in its WinTeam system.

19. This information is confidential to Allied Universal and is not readily available to competitors or the public.

20. Allied Universal takes reasonable steps to protect this information. It restricts access to its personnel, password-protects its operating systems, including the WinTeam system, and requires employees with access to sign confidentiality and appropriate restrictive covenant agreements. This information gives Allied Universal a significant economic and competitive advantage over competitors who do not have it.

**B. <u>Defendant Davenport-Cortivo's Employment with Allied Universal.</u>**

21. Davenport-Cortivo has worked for Allied Universal since 2022. Before the events giving rise to this lawsuit, he worked as a Project Manager at an Allied Universal security account in the St. Louis metropolitan area (the "Prior Site").

22. In or about the first half of 2026, GardaWorld took over the security services for the Prior Site.

23. On June 22, 2026, just as GardaWorld was taking over the Prior Site, Davenport-Cortivo applied for a transfer and promotion to the position of Account Manager at one of Allied Universal's most important client sites: a large, well-known online retail distribution center in the St. Louis metropolitan area (the "Distribution Center"). The promotion came with a pay raise.

24. In connection with his promotion, Davenport-Cortivo signed the Agreement. In exchange, Allied Universal promoted him and gave him greater access to confidential information, valued business relationships and goodwill, and specialized training. *See* Ex. A, §§ 1, 4.

25. As Account Manager, Davenport-Cortivo ran the day-to-day security operations at his site. He managed scheduling, performance, client engagement and payroll. He was the primary point of contact and direct supervisor of the site's Security Professionals.

26. Davenport-Cortivo had full access to Allied Universal's WinTeam operating system through which he could see each Security Professional's pay rate, work schedule and contact information, including their phone number and home address, and their dates of employment.

27. His knowledge went well beyond a roster. As the Security Professionals' supervisor, he knew which officers were strong performers and which were dissatisfied, who was a flight risk, and exactly what each was paid. With that information, he knew whom he had an opportunity to take and that he could draw them away by offering a few dollars more per hour.

28. On September 1, 2026, only two months after he was promoted, he gave notice that he was resigning to join GardaWorld. His last day with Allied Universal was September 17, 2026.

29. Upon information and belief, Davenport-Cortivo did not leave Allied Universal for a better job. He went backward. He returned to the very Prior Site he had left months earlier — now staffed by GardaWorld — to work again as a Project Manager, the same lower-level position he had held before his promotion.

30. Upon information and belief, that move came with a pay cut. Davenport-Cortivo gave up the higher salary of an Allied Universal Account Manager to take a lower-paying Project Manager job with GardaWorld at the site he had just left.

31. The sequence is revealing. In the span of roughly two months, Davenport-Cortivo sought out a promotion and a raise, signed the Agreement to obtain them, used his new position to learn the pay rates, schedules, and personal contact information of the Distribution Center's entire security workforce, and then walked away from the promotion to take a pay cut at the site he had just come from. People do not give up a promotion and a raise for a demotion and a pay cut without a reason.

32. The reason is that the promotion was never truly about the Account Manager job. It was a means to an end — a way to get inside Allied Universal's confidential personnel records so that Davenport-Cortivo could deliver the Distribution Center's trained security force to GardaWorld. Upon information and belief, Davenport-Cortivo's apparent pay cut is more than offset by what he stands to gain from GardaWorld, including, a referral or recruitment bonus for each Allied Universal Security Professional he brings over. What appears to be a pay cut on paper is, in substance, a trade: a lower base wage in exchange for being paid to raid his former employer's workforce. The timing and this pay structure confirm that Davenport-Cortivo's transfer and promotion were not a legitimate career move, but a calculated step to misappropriate Allied Universal's confidential information and workforce for a competitor.

**C. <u>Davenport-Cortivo's Post-Employment Obligations</u>.**

33. The Agreement Davenport-Cortivo signed imposes post-employment restrictions on his conduct, referred to as the "Post Separation Obligations." *See* Ex. A, §§ 4, 9.

34. Section 4(A) contains a non-compete provision that prohibits Cortivo-Davenport from competing against the Company in any city or county where Cortivo-Davenport provided services for the Company for a period of twelve months after his employment with Allied Universal ended.

35. Section 4(A) states in relevant part:

> **<u>Non-Compete</u>**. Employee covenants and agrees that, for a period of twelve (12) months following Employee's last day of employment with the Company, Employee shall not: (a) engage in any Competitive Activity (as defined below) within the Prohibited Territory (as defined below); or (b) assist anyone else in engaging in Competitive Activity within the Prohibited Territory.

36. Section 4(A)(i) defines "Competitive Activity" as follows:

> "**<u>Competitive Activity</u>**" means competing against the Company by performing the same or substantially similar work as Employee performed on behalf of the Company at any time during the last twelve (12) months of employment with the Company in a Prohibited Territory for an entity engaged in the Business (as defined below). Notwithstanding the foregoing, owning the stock or options to acquire stock totaling less than 5% of the outstanding shares in a public company shall not constitute, by itself, Competitive Activity.

37. Section 4(D)(ii) defines "Business" as follows:

> "**<u>Business</u>**" means: (a) the business of marketing, selling and/or providing security services, including (1) guard and other contract security or event staffing services; (2) security system monitoring; (3) security system design, integration, updating, and installation; (4) security and risk consulting services; (5) investigations; (6) personal protection; and (7) threat, disaster and emergency response; and (b) the business engaged in by the Company as of the Employee's last day of employment with the Company.

38. Section 4(D)(iii) defines "Prohibited Territory" as follows:

> "**<u>Prohibited Territory</u>**" means: (a) each city and county (or equivalent local unit of government) where Employee assisted the Company to engage in the Business at any time during the last twelve (12) months of Employee's employment with the Company; and (b) any territory assigned to Employee by the Company at any time during the last twelve (12) months of Employee's employment with the Company.

39. Section 7 of the Agreement contains a future employer provision which provides, in relevant part:

> **<u>Future Employers</u>**. Employee agrees to promptly notify the Company in writing of the name and address of each business with whom Employee is associated (as an employee or as an independent contractor) for a period of twenty four (24) months following the end of Employee's employment with the Company. Employee further: (a) agrees that the Company may notify any such business about the existence and terms of this Restrictive Covenant Agreement; (b) irrevocably consents to any such

> notification; and (c) covenants not to sue the Company based on any such notification.

40. Section 4C contains a "Non-Raiding" covenant. For twelve months after his last day at Allied Universal, it bars him from recruiting or soliciting Allied Universal's employees. It states in relevant part:

> **Non-Raiding**. Employee covenants and agrees that for a period of twelve (12) months following Employee's last day of employment with the Company, Employee shall not, directly or indirectly: (a) hire or engage as an employee or as an independent contractor any person employed by the Company; and/or (b) recruit, solicit or encourage any employee or independent contractor to leave his or her employment or engagement with the Company (i) where such person was employed within the Prohibited Territory; (ii) where such person reported, whether formally or informally, to Employee and/or to Employee's direct or indirect reports; (iii) where Employee was involved with the hire or promotion of such person by the Company; (iv) where such person had job responsibilities for the Company involving one or more Restricted Customers; and/or (v) where Employee had access to Confidential Information (including without limitation pay rates and bill rates) regarding the person's employment by the Company.

41. Section 4D contains a Confidential Information covenant. For five years after his last day, it bars him from using or disclosing the Company's Confidential Information. It states in relevant part:

> **Confidential Information**. Employee covenants and agrees that, except to the extent the use or disclosure of any Confidential Information is required to carry out Employee's assigned duties with the Company, during Employee's employment with the Company and for five (5) years thereafter: (a) Employee shall keep strictly confidential and not disclose to any person not employed by the Company any Confidential Information; and (b) Employee shall not use for Employee or for any person or entity other than the Company any Confidential Information.

42. The Agreement defines "Confidential Information" to include "employee wages and other personnel information" and information about the Company's customers, "including customer lists, preferences, contact information, contractual terms, prices, and billing histories." *See* Ex. A, § 4D(i).

43. Section 7 requires Davenport-Cortivo to notify Allied Universal in writing of each business he becomes associated with for twelve months after his employment ends, and it allows Allied Universal to notify that business of the Non-Compete Agreement. *See* Ex. A, § 7.

44. Davenport-Cortivo agreed that the restrictions are fair, reasonable, and necessary to protect Allied Universal's legitimate business interests, including its goodwill with its customers and employees and its Confidential Information. *See* Ex. A, § 9.

45. The Agreement provides that a breach of the Post Separation Obligations entitles Allied Universal to an injunction, that Davenport-Cortivo consents to the injunction, and that Allied Universal need not post a bond to obtain it. *See* Ex. A, § 10.

46. The Agreement sets liquidated damages of $100,000 for each violation of the non-compete, non-interference, or confidentiality covenants, and six months of the solicited employee's annual compensation for each violation of the non-raiding covenant. *See* Ex. A, § 11.

47. Universal Protection Service, LLC may enforce the Agreement even though it names Universal Services of America, LP as the contracting party. The Agreement defines the "Company" to include Universal Services of America, LP "together with its subsidiaries, affiliates and related companies." (Ex. A, Preamble.) Section 8 extends that definition to any entity under common control with Universal Services of America, LP and to any affiliate for whom Davenport-Cortivo performed services during his last twelve months of employment. (Ex. A, § 8.) Section 13 likewise includes any affiliated entity to which the Agreement is assigned. (Ex. A, § 13.) Universal Protection Service, LLC is such an affiliate and was the entity Davenport-Cortivo actually worked for as Account Manager. It therefore falls within the Agreement's defined "Company" and may enforce his post-separation obligations as fully as the named signatory.

48. Davenport-Cortivo received sufficient consideration for the Post Separation Obligations in the form of his promotion and continued employment with Allied Universal, where he continued to have access to Allied Universal's confidential information, employee relationships, business relationships, goodwill, and specialized training.

**D. <u>Davenport-Cortivo's Employment With GardaWorld Violates The Non-Compete Covenant in 4A of the Agreement</u>.**

49. Less than twelve months after his separation from Allied Universal, Davenport-Cortivo accepted employment with GardaWorld — a direct competitor engaged in the security-services business — as a Project Manager, a similar role he held at the same site before his transfer and promotion to the Account Manager position with Allied Universal.

50. In that role, Davenport-Cortivo engages in Competitive Activity within the Prohibited Territory: he performs the same or substantially similar work for GardaWorld that he performed for Allied Universal during the last twelve months of his employment, in the same St. Louis metropolitan market that was assigned to him and in which he assisted Allied Universal during that same period.

51. Davenport-Cortivo's employment with GardaWorld breaches the non-compete covenant in Section 4A of the Agreement because each element is satisfied: (i) fewer than twelve months have elapsed since his employment with Allied Universal ended; (ii) GardaWorld is engaged in the Business — the security-services business in which Allied Universal was engaged during the last twelve months of his employment; (iii) Davenport-Cortivo is performing for GardaWorld the same or substantially similar work he performed on behalf of Allied Universal during those last twelve months; and (iv) he performs that work within the Prohibited Territory — the same metropolitan market in which he assisted Allied Universal, or that Allied Universal assigned to him, during his last twelve months of employment.

52. Consistent with Federal Rule of Civil Procedure 65, Allied Universal is entitled to a temporary restraining order and preliminary injunction to stop Davenport-Cortivo's ongoing breaches.

**E. <u>Davenport-Cortivo's Is Raiding Allied Universal's Workforce Using Allied Universal's Confidential Information In Violation of Sections 4C and 4D of the Agreement.</u>**

53. Allied Universal Security Professionals assigned to the site Davenport-Cortivo managed must complete specialized, client-specific, training before they can work on site. The training covers the client's badge, screening, and access control and facility screening processes. Security Professional applicants must clear multiple background checks and obtain a security license, which takes approximately two weeks. This in-depth process makes it difficult to recruit Security Professionals for the site.

54. As Account Manager, Davenport-Cortivo knew each of his Security Professional's pay rate, schedule, and personal contact information, including their phone numbers. He obtained that information through Allied Universal's WinTeam system.

55. After he resigned, Davenport-Cortivo used the Security Professionals' pay rates, schedules, and phone numbers to recruit Allied Universal's Security Professionals for GardaWorld.

56. On or about October 22, 2026, someone from GardaWorld named john sent a mass text message to all the Allied Universal Security Professionals who worked at the site Davenport-Cortivo managed during his tenure. The text stated:

> "Hello, , this is John from GardaWorld Security we have a hiring event scheduled for October 20 from 10am – 2 pm at Memorial hall in Blanchette Park 1900 Randolph St. St. Charles, MO 63301. We will be interviewing and making on the spot job offers! Sign up here https://calendy.com/john-brooks-1/gardaworld-security-hiring-event-clone1. Please

remember to bring the following documents: I-9 forms for onboarding (https://shorturl.at/4aE2z)
If you served in the military, your DD214
Direct Deposit Information
-Highly encouraged to bring proof of education with you
-Complete the assessment following your application. Hope to see you there!"

See Exhibit B.

57. The text was signed "John with GardaWorld Security." It invited the officers to a GardaWorld hiring event on October 20, 2026, and offered pay significantly higher than the wage rate at the site Davenport-Cortivo managed.

58. Upon information and belief, Davenport-Cortivo either sent this text, using the phone numbers he took from Allied Universal's WinTeam system, or he gave them to whoever sent the text.

59. Davenport-Cortivo had the text sent to all Security Professionals who were assigned to his site during Davenport-Cortivo's tenure. Davenport-Cortivo had their cell phone numbers from WinTeam. Allied Universal's current Account Manager received the text even though she never applied to GardaWorld.

60. Several Security Professionals have resigned or are leaving for GardaWorld. One of the Security Professionals gave notice on October 16, 2026, and is joining GardaWorld as an assistant account manager. Another Security Professional is awaiting a start date at GardaWorld. Others have signaled that they intend to leave.

61. Each Security Professional Davenport-Cortivo solicited worked for him within his assigned territory, reported to him, and was a person about whom he had confidential information, including their pay-rates and contact information, including their phone numbers. Each therefore falls squarely within the non-raiding covenant. *See* Ex. A, § 4C.

62. He has successfully hired several Allied Security Professionals, and even for those whom he is not successful at hiring, he is harming Allied Universal by putting their information into the GardaWorld system.

63. Davenport-Cortivo is in violation of his Non-Raiding obligations and threatens Allied Universal's ability to fulfill its contract with its customer.

64. Allied Universal reported the solicitation to GardaWorld's regional leadership. GardaWorld said it was unaware of the conduct and would stop it. However, the solicitation has continued.

**COUNT I – BREACH OF CONTRACT**

65. Allied Universal incorporates by reference the allegations in the preceding paragraphs as if fully restated herein.

66. The Agreement is a valid, legally binding, and enforceable contract.

67. Allied Universal gave sufficient consideration for the Agreement in the form of Davenport-Cortivo's promotion and continued employment, where he continued to have access to Allied Universal's confidential information, business relationships, goodwill, and specialized training.

68. Allied Universal performed all its obligations under the Agreement, and any condition precedent has occurred or has been performed.

69. Davenport-Cortivo breached the Non-Compete Covenant in Section 4A, under which he agreed that, for twelve months after his last day, he would not engage in Competitive Activity within the Prohibited Territory. Each element is satisfied because (i) the restricted period applies, because fewer than twelve months have elapsed since his employment with Allied Universal ended on September 17, 2026; (ii) GardaWorld is engaged in the security-services

business in which Allied Universal was engaged during the last twelve months of his employment; (iii) he is performing for GardaWorld the same or substantially similar work he performed on behalf of Allied Universal during those last twelve months; and (iv) he performs that work within the Prohibited Territory — the same St. Louis metropolitan market in which he assisted Allied Universal, or that Allied Universal assigned to him, during his last twelve months of employment.

70. Davenport-Cortivo breached the Non-Raiding covenant in Section 4C, under which, for twelve months after his last day, he agreed not to recruit, solicit, or encourage any Company employee or independent contractor to leave the Company. Each element is satisfied: (i) the restricted period applies, because the solicitation occurred in October 2026, fewer than twelve months after his employment ended on September 17, 2026; (ii) he engaged in the prohibited conduct by recruiting and soliciting Allied Universal's Security Professionals to leave Allied Universal for GardaWorld, including through the mass text message inviting them to a GardaWorld hiring event that offered higher pay; and (iii) each solicited Security Professional falls within the covenant because one or more of its connecting conditions is met as to each — the Security Professionals were employed within the Prohibited Territory (the St. Louis site he managed); they reported to Davenport-Cortivo; he was involved in their hire or promotion; and he had access to Confidential Information, including their pay rates, regarding their employment with Allied Universal.

71. Davenport-Cortivo breached the Confidential Information covenant in Section 4D, under which, for five years after his last day, he agreed not to use or disclose the Company's Confidential Information for the benefit of anyone other than the Company. Each element is satisfied: (i) the restricted period applies, because the conduct occurred well within five years of his September 17, 2026 last day; (ii) the information at issue — the Security Professionals' pay

rates, schedules, and personal contact information is Confidential Information as the Agreement defines it, which expressly includes employee wages and other personnel information and personnel contact information; (iii) he used that information, which he obtained from Allied Universal's WinTeam system, to identify, locate, and solicit the Security Professionals, and he disclosed their personal cell-phone numbers by furnishing them to GardaWorld or causing the mass text to be sent to those numbers; and (iv) he used and disclosed the information for the benefit of himself and GardaWorld rather than the Company.

72. Davenport-Cortivo breached Section 7 by failing to notify Allied Universal in writing of his association with GardaWorld.

73. Davenport-Cortivo is continuing these breaches and, upon information and belief, intends to continue them.

74. Allied Universal will suffer irreparable harm unless Davenport-Cortivo is enjoined. The harm includes the loss of a trained, assembled workforce, the disruption of Allied Universal's service to its client, and damage to its client relationships and goodwill, none of which money can fully measure.

75. Allied Universal does not have an adequate remedy at law.

76. Consistent with Federal Rule of Civil Procedure 65, Allied Universal is entitled to a temporary restraining order and preliminary injunction.

77. Allied Universal is also entitled to its damages, including the liquidated damages set out in Section 11 of the Non-Compete Agreement.

**COUNT II – UNJUST ENRICHMENT**

78. Allied Universal incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

79. Allied Universal conferred substantial benefits on Davenport-Cortivo, including a promotion, specialized training, and access to its confidential information, customer relationships, and goodwill.

80. Davenport-Cortivo accepted and retained those benefits.

81. Davenport-Cortivo then used those benefits—the training he received and the confidential employee information he obtained—to recruit Allied Universal's workforce for a direct competitor.

82. Davenport-Cortivo was unjustly enriched by converting Allied Universal's investment in its workforce and confidential information to the benefit of GardaWorld and himself.

83. It would be inequitable for Davenport-Cortivo to retain that benefit without compensating Allied Universal for its value.

84. Allied Universal is entitled to restitution and disgorgement of the value Davenport-Cortivo received.

**PRAYER FOR RELIEF**

WHEREFORE, Allied Universal respectfully prays that this Court:

A. Accept jurisdiction over this matter;

B. Issue a Temporary Restraining Order and preliminary injunction enjoining Davenport-Cortivo, and all those acting in concert with him, from (i) engaging in Competitive Activity within the Prohibited Territory, or assisting anyone else in doing so, in violation of Section 4A of the Non-Compete Agreement; (ii) recruiting, soliciting, or hiring Allied Universal's employees in violation of Section 4C of the Non-Compete Agreement; and (iii) using or disclosing Allied Universal's Confidential Information and trade secrets in violation of Section 4D of the Non-Compete Agreement;

C. Issue a Permanent Injunction enjoining the same conduct;

D. Order Davenport-Cortivo to return all of Allied Universal's Confidential Information, in whatever form, and to take affirmative steps to protect them, consistent with Section 4D of the Non-Compete Agreement;

E. Award Allied Universal its reasonable attorneys' fees and costs incurred in this matter; and

F. Enter any other Order that the interests of justice and equity require.

Respectfully submitted this [ 9th ] day of November, 2026.

**SANDBERG PHOENIX, P.C.**

*/s/ Benjamin R. Wesselschmidt*
Benjamin R. Wesselschmidt (#66321MO)
701 Market Street, Suite 600
St. Louis, MO 63101
T: (314) 231-3332
Direct: (314) 446-4222
F: (314) 241-7604
bwesselschmidt@sandbergphoenix.com

-and-

Matthew D. Crawford (*PHV pending*)
John B. Kahle (*PHV pending*)
**MARTENSON, HASBROUCK & SIMON LLP**
2573 Apple Valley Road NE
Atlanta, Georgia 30319
T: (404) 909-8100
F: (404) 909-8120
mcrawford@martensonlaw.com
jkahle@martensonlaw.com

*Counsel for Plaintiff*

**VERIFICATION**

I, Joe Saputo, verify under penalty of perjury that the factual statements in the foregoing Verified Complaint for Injunctive Relief and Damages are true and correct to the best of my knowledge and understanding.

Joe Saputo

Joe Saputo
General Manager
Allied Universal

11-6-2026

Date

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this [ 9th ] day of November, 2026, he caused the within and foregoing document to be filed with the Clerk of the Court using the CM/ECF system, and that he served a copy of the foregoing on the Defendant John Davenport-Cortivo by electronic mail and United States Mail:

John Davenport-Cortivo
1139 Roller Road,
Saint Clair, Missouri 63077-2808
jmdavcor@outlook.com

*/s/ Benjamin R. Wesselschmidt*
Benjamin R. Wesselschmidt